UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

GAMIEN BATCHELOR,

                    Plaintiff,           **MEMORANDUM & ORDER**
                                            11-CV-2058 (MKB)

        v.

THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CORRECTION,
COMMISSIONER DORA SHIRO, ASSISTANT
COMMISSIONER RICHARD R. WHITE,
DIRECTOR DENNIS WALL, DEPUTY DIRECTOR
ALEXIS CASTILLO and CHIEF OF
DEPARTMENT LARRY DAVIS, SR.,

                    Defendants.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Gamien Batchelor brings the above-captioned action against Defendants City of

New York, New York City Department of Correction ("DOC"), DOC Commissioner Dora Shiro,

Assistant Commissioner Richard R. White, Director Dennis Wall, Deputy Director Alexis

Castillo and Chief of Department Larry Davis, Sr., alleging claims of race and gender

discrimination, retaliation and creation of a hostile work environment pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human

Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), the New York City Human Rights

Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"), and 42 U.S.C. § 1983 and § 1981.

Defendants moved for summary judgment as to all claims. (Docket Entry No. 36.) On October

16, 2013, the Court referred the motion to Magistrate Judge Vera M. Scanlon for a report and

recommendation. On February 16, 2014, Judge Scanlon issued a report and recommendation

("R&R"), recommending that the Court (1) dismiss all of Plaintiff's claims against DOC,

(2) grant Plaintiff's request to withdraw her § 1983 claims, (3) dismiss Plaintiff's § 1981 gender discrimination claims, (4) dismiss Plaintiff's § 1981, NYSHRL and NYCHRL claims against Defendant Schiro in her individual capacity, (5) grant Defendants' summary judgment motion as to Plaintiff's federal, state and city race and gender discrimination claims as to the preferential allocation of vacation and holiday allegations during her employment at the Investigations Division, (6) deny Defendants' summary judgment motion as to Plaintiff's federal, state and city race and gender discrimination claims as to specialty-pay denial, (7) grant Defendants' summary judgment motion as to Plaintiff's federal, state and city law race and gender discrimination claims as to her transfer from the Investigations Division to the North Infirmary Command, (8) grant Defendants' summary judgment motion as to Plaintiff's federal, state and city law gender discrimination claims relating to various employment actions taken against her during her time at the North Infirmary Command and the Anna M. Kross Center, (9) grant Defendants' summary judgment motion as to Plaintiff's federal, state and city law hostile work environment claims stemming from her time at the North Infirmary Command and the Anna M. Kross Center, and (10) grant Defendants' summary judgment motion as to Plaintiff's federal, state and city law retaliation claims.  (Docket Entry No. 45.)  Plaintiff timely filed objections.  (Docket Entry No. 48.)  Defendants did not file objections.  For the reasons set forth below, the Court adopts Judge Scanlon's R&R in its entirety.

## I.    Background

The facts and procedural history of this action are set forth in detail in the R&R and are repeated here as necessary to provide context for the Court's decision.

Plaintiff is an African-American woman who is currently employed as a captain with the DOC.  (Def. 56.1 ¶ 2 (citing Def. Ex. B, Deposition of Gamien Batchelor, ("Pl. Dep.") 8:2); Compl. ¶ 5.)  Plaintiff began working with DOC as a corrections officer in 2001, and was

stationed at the North Infirmary Unit ("NIC") from 2005 through 2007. (Pl. Ex. A, Affidavit of Gamien Batchelor ("Batchelor Aff.") ¶ 1; Pl. Dep. 21:25–22:5.) Plaintiff was appointed to the rank of captain on January 19, 2007, and in December 2007 applied for a transfer to work in the Investigation Division ("ID"). The parties dispute what criteria were used by the ID in selecting captains. According to Plaintiff, one of the factors was a DOC-wide "promotions list" number that is assigned to each employee and is designed to represent that employee's seniority. (Pl. Dep. 29:17–24.) Plaintiff contends that another factor was the applicant's score on a citywide administration test. (Pl. Ex. D, Affidavit of Robin Franklin ("Franklin Aff.") ¶ 7.) Plaintiff was interviewed in part by Richard White, a Deputy Commissioner in the ID, and Wall, a Deputy Director in the ID. (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.) Plaintiff and another individual, Nathan Bialek, were both selected to work as captains in the ID on February 29, 2008. (Pl. Ex. C.)

      **a.    Performance in the Investigations Division**

Plaintiff began working in the ID on March 7, 2008, (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2), where she was responsible for supervising investigators and keeping track of the status of investigations, (Def. Ex. C, Deposition of Richard White ("White Dep.") 17:5–7). According to White, Plaintiff was a "fair" captain who "had a lot to learn." (*Id*. at 16:24–17:4.) Plaintiff "had some difficulties making the adjustments to the division," but after she worked on some of her difficulties "under the supervision of her deputy directors," and "staff supervisors," White did not recall "any subsequent issues." (*Id.* at 17:4–15.) According to Wall, Plaintiff had "difficulty managing case loads," presented inadequate verbal reports at monthly supervisor's meetings, and in particular had problems presenting the statistics on her cases and could not answer questions about specific cases. (Def. Ex. F and Pl. Ex. D, Deposition of Dennis Wall ("Wall Dep.") 17:18–24, 19:22–23, 20:3–6.) Wall never told Plaintiff about her performance problems, nor did he

note her challenges in any written records or reports.  (*Id.* at 20:14–21:17.)  Wall believed

Plaintiff's inadequacies were "quite obvious at the meetings."  (*Id.* at 20:14–21:17.)

### b.    Temporary duty status

At an unspecified time, Wall placed Plaintiff on Temporary Duty ("TDY") status because

of her inadequate performance.  (*Id.* at 35:13–25.)  According to White, the factors that would be

taken into account when deciding who would be assigned to a permanent position and who

would be assigned to TDY status were "prior experience within the division, . . . prior experience

within the agency, [and] any courses or knowledge or training you had received within the

agency."  (White Dep. 28:14–29:10.)  DOC policy document on Temporary Duty Assignments

states that "Temporary Duty Personnel are full duty personnel temporarily assigned from their

parent command to another Facility / Division / Unit for a short term assignment."  (Pl. Ex. I

at 1.)  A TDY assignment required a TDY Request/Extension Form with the reason for the

appointment and the length of the assignment.  (*Id.*)  The TDY assignments are for a duration of

no more than 90 days, which could be extended if requested in writing.  (*Id.*)  Wall did not tell

Plaintiff that he was placing her on TDY status, and does not recall why he did not tell Plaintiff.

(Wall Dep. at 36:2–9.)

### c.    Specialty pay

On June 27, 2008, Commissioner Horn issued a memorandum announcing a specialty-

pay for certain positions, including a captain in ID, if in the position for at least six months and

performing satisfactorily.  (Pl. Ex. G at 1.)  Individuals who were serving less than six months

would qualify upon reaching the requisite time period.  (*Id.* at 2.)  For Plaintiff and Bialek, who

were named ID Captains on March 7, 2008, (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2), their specialty-pay

commenced September 7, 2008.  The specialty-pay would increase Plaintiff's annual salary of $80,000 in 2009 by $2,400.  (Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.)

In October 2009, Plaintiff asked Alex Castillo, Deputy Director of the ID, about her specialty-pay and was told for the first time that she would not be receiving the pay because she was on TDY status.  (Pl. Dep. 27:2–19.)  Castillo told Plaintiff that Wall had "given Captain Bialek the permanent line," because "[t]hat's his boy."  (*Id.* at 27:19–28:12.)  Plaintiff protested by stating, "It's not fair, that's not the way you do business," and Castillo responded, "That's just the way it is."  (*Id.* at 28:14–17.)  Bialek received specialty-pay in October 2009, and Plaintiff did not receive specialty-pay.  (Def. 56.1 ¶¶ 6, 9; Pl. 56.1 ¶¶ 6, 9.)

### d. Vacation, holidays and weekly pass days

Plaintiff and Bialek each had two "pass days" off each week; Plaintiff's pass days were Sunday and Monday, while Bialek's were Friday and Saturday.  (Def. 56.1 ¶¶ 6, 8; Pl. 56.1 ¶¶ 6, 8.)  The record does not indicate whether pass days were selected by Plaintiff and Bialek, or if those days were assigned to them; nor does Plaintiff state whether she would have preferred days other than Sunday and Monday as her pass days.  According to Plaintiff, she often worked on major and/or Christian holidays, including Christmas, Easter and Thanksgiving.[1]  (Pl. Dep. 25:13–23.)  Plaintiff contends that Bialek did not work on either Christian or Jewish holidays.  (*Id*. at 25:6–12; Pl. Ex. A, Affidavit of Gamien Batchelor ("Batchelor Aff.") ¶ 5.)  The time sheets show that Plaintiff worked on Christmas Day in 2008 and 2009, but did not work on Easter and Ash Wednesday in either year as those days were her pass days.  (Def. Ex. F at 2, 4; Batchelor Aff. ¶ 5.)  They also show that Bialek worked on Christmas Day and on Easter Sunday

---

[1] Defendants' vacation policy is not in the record, and neither party explains how vacation was scheduled or allotted.

in 2008 and 2009.  (Def. Ex. E.)   Neither party addresses the total number of vacation days allotted to either Plaintiff or Bialek each year, how many vacation days were taken by either individual, or whether either individual requested and did not receive particular days off. Plaintiff claims that she held seniority # 7 and Bialek held seniority # 8, but "was denied her vacation pick while Bialek was granted his."[2]  (Pl. 56.1 ¶ 6.)

### e. Plaintiff's transfer to the North Infirmary Command and the Anna M. Kross Center

In January 2010, as a result of budget cuts, the ID was preparing to lose some staff. (Wall Dep. 55:10–12.)  White and Wall decided that "if we were going to work with less staff we would work with the best staff we could find," and subsequently transferred Plaintiff to NIC. (Def. 56.1 ¶10; Pl. 56.1 ¶10; Wall Dep. 55:6–14.)  Plaintiff contends that White told her that transfers would be determined based on seniority.  (Pl. Dep. 29:2–5.)  Plaintiff claims that she had greater seniority than Bialek.  (*Id.* at 29:19–30:8.)  Plaintiff was transferred to NIC in January 2010 and remained there until April 2010.  (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10; Pl. Dep. 31:9–10.)  Bialek remained in the ID.  (Pl. 56.1 ¶ 10; Def. Mem. 8.)  According to the Complaint, Plaintiff did not have a locker and her shift hours were changed to a rotating schedule.[3]  (Compl. ¶¶ 34, 35.)  Plaintiff complained to Warden Evelyn Mirabel on March 14, 2010, that the lack of a locker and the change in her work schedule was discriminatory.  (*Id.* ¶ 36.)

---

[2]  In her opposition papers to Defendants' motion for summary judgment, Plaintiff includes a document titled "Vacation Pick 2009–2010."  (Pl. Ex. E., "Vacation Pick.")  The document is a table showing the names of captains and investigators along with a "Seniority" number and a "Pick" number, in columns with two dates across the top of each column.  Each column has at least one name crossed out.  Bialek and Plaintiff are in different columns, and their seniority and pick numbers are illegible.  Plaintiff's name is one of eight names on the list with a large "X" written on it, while Bialek's name does not have a handwritten "X."

[3]  Plaintiff has not provided any testimony or sworn statements of her job responsibilities or experience while at NIC.

On April 21, 2010, Plaintiff was told that the NIC building was closing. (Def. 56.1 ¶ 18; Pl. 56.1 ¶18; Pl. Dep. 58:10–25.) Plaintiff was transferred to the Anna M. Kross Center ("AMKC"). (Def. 56.1 ¶ 18; Pl. 56.1 ¶18; Pl. Dep. 31:2–21.) Plaintiff and four other captains, who were the "last five at the bottom of the seniority list," were transferred to AMKC. (Pl. Dep. 13–21.)

### f. Locker room at AMKC

Plaintiff started working at AMKC in April 2010. (*Id*. at 47:12–14.) During the time that Plaintiff worked at AMKC, there were a total of four locker rooms for female employees, two for corrections officers and two for captains. (*Id*. at 42:2–18.) According to Plaintiff, she was to receive a key to one of the locker rooms and be assigned a locker but she did not receive a key until approximately two-and-a-half to three months after she first began working at AMKC, and was never assigned a locker. (*Id*. at 44:14–45:10.) Plaintiff drove to work wearing the pants and boots of her uniform, and changed into the rest of her uniform in the car once she arrived at work. (*Id*. at 45:11–22.) Although she complained to an administrative captain about not having a locker, she was "brushed off." (*Id*. at 46:9–47:14.) Plaintiff told her union representative who was "trying to work on it." (*Id.*) In June 2010 other captains assisted Plaintiff in obtaining a key to one of the locker rooms, and Plaintiff brought her own locker from her previous post at NIC. (*Id*. at 47:15–48:21.) The locker room was a repurposed closet, approximately six feet by six feet, which had no ventilation, toilets, or running water, and was shared by five captains. (Pl. 56.1 ¶15: Pl. Dep. 41:11–17, 44:5–13.) The other locker room assigned to female captains was larger, but Plaintiff did not have a key to that room. (Pl. Dep. 48:8–12.) Plaintiff had no knowledge about the male locker rooms. (Def. 56.1 ¶ 15; Pl. 56.1 ¶15; Pl. Dep. 42:19–24.) There is no evidence in the record about the number, size or condition of the male locker rooms or the amenities that they included.

### g. Scrutiny and discipline at AMKC

According to Plaintiff, in May 2010, shortly after she arrived at AMKC, Assistant Deputy Warden ("ADW") Raylene Moses made a "threatening remark" to her by saying that Plaintiff was "no longer in Investigations and now [she's] in AMKC so [Plaintiff] will now see what's gonna happen to [her]." (Pl. Dep. 52:7–17.) Moses and another ADW, Livingstone Major were in a higher rank than Plaintiff, who was a Captain, and Plaintiff was therefore required to follow any lawful order issued by the ADWs. (*Id.* at 40:11–41:3.) According to Plaintiff, both Moses and Major subjected Plaintiff to excessive scrutiny and "harass[ment]" in overseeing the performance of her duties. (*Id.* at 54:12–18.) They "single[d] [Plaintiff] out" to ask if she had ensured that inmates had received their meals. (*Id.* at 54:19–55:9.) Although Plaintiff contends that she was the only captain singled out, (*id.* at 55:8–15), she admits that she did not know whether Major had ever contacted another captain other than Plaintiff to inquire whether or not the inmates had received their meals, (*id.* at 55:16–19).

According to Plaintiff, Major subjected her to excessive scrutiny when he questioned Plaintiff at least 20 to 30 times during the year-and-a-half that Plaintiff worked at AMKC as to why she was not in the corridor during "inmate movement."[4] (*Id.* at 56:2–17.) During institutional emergency preparedness drills, when all captains and corrections officers were required to put on protective gear and assemble in the corridors, Major singled out Plaintiff and questioned why she was not suited up properly.[5] (*Id.* at 36:2–39:5.) Plaintiff claims that the

---

[4] Plaintiff testified that "they would like us to be present for movement . . . to ensure that it's being done correctly [by the corrections officers]." (Pl. Dep. 57:8–11.)

[5] Plaintiff testified that "several times," after the captains and officers had assembled in the corridors, ADW Major told her to put her helmet visor down, even though "the male captains who would be right with me would be exactly dressed as I am and he would never say anything to them." (Pl. Dep. 39:1–40:10.) The other captains, who were not similarly instructed to place their visors down, would often laugh at this. (*Id.*) Major made comments such as "[w]hy don't

protective gear, designed to protect officers during an institutional alarm requiring their response to an inmate or other emergency, often fit the women poorly. (Pl. Dep. 36:15–23.) The helmets in particular tended to be too big or to have missing straps. (*Id*. at 36:20–37:17, 38:5–13.)

Throughout 2010, Major ordered Plaintiff to write two or three reports explaining why she failed to complete some required tasks, such as "why didn't you come to the front of the building fast enough . . . ." (*Id.* at 34:14–21, 36:1.) Moses issued two "frivolous" command disciplines in June and July of 2010, alleging that Plaintiff had not completed an "investigations package" that had been assigned to her, and that Plaintiff had not properly performed her duties with respect to another package, by removing some documents from that package.[6] (*Id.* at 50:22–51:4.) Both of these command disciplines were dismissed for the technical reason of improper filing. (*Id.* at 51:12–52:2.)

On July 2, 2010, Plaintiff filed a request to transfer out of AMKC because of the "Hostile Work Environment." (Pl. Ex. O.) On August 20, 2010, Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the New York State Human Rights Division, alleging discrimination on the basis of race, color, sex, retaliation and hostile work environment. (Def. Ex. G, "EEOC charge.") In the EEOC charge, Plaintiff alleged that Defendants discriminated against her while she worked at the ID by depriving her of specialty pay and transferring her out of the unit while allowing a less-qualified male to remain in the unit,

---

you have on your gear correct, just do what I say, don't ask me any questions . . . you're not to question me . . . you just do what you're told," in a "belittl[ing]" and disrespectful manner. (*Id.* at 40:6–10.)

[6] Judge Scanlon noted that the record does not include any evidence regarding the July 2010 command discipline. (R&R 20 n.9.) Plaintiff's performance service report, which reflects a June 2010 command discipline that was dismissed, does not include a reference to a July 2010 command discipline. Judge Scanlon analyzed the July 2010 command discipline as if it were identical to the one received in June 2010 as far as content and outcome.

that her transfer to the NIC and AMKC Center was in retaliation for questioning why she was being treated differently, and her working conditions at AMKC with respect to the locker room were "in further retaliation" because the male supervisors had locker rooms with air conditioning and showers, but Plaintiff and the other female supervisors did not. (Pl. Ex. G.) Although filed on August 20, 2010, the EEOC charge was signed and notarized on August 14, 2010. (*Id.*)

On August 18, 2010, Major issued a command discipline to Plaintiff alleging that Plaintiff had not completed an investigation that Plaintiff contends was never assigned to her. (*Id.* at 33:9–34:8, 59:11–60:10.) As a result of the command discipline, Plaintiff lost one vacation day. (*Id.* at 33:24–34:1.) Plaintiff appealed the command discipline to the DOC Chief Davis, but never received a response. (*Id.* at 34:3–5.) Plaintiff's October 5, 2010 performance service report has an annotation indicating that as of the date of report, the resolution of the August 18, 2010 command discipline was still pending. (Def. Ex. H.)

## II. Discussion

### a. Standard of Review

#### i. Report and Recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and recommendation, the district court reviews the parts of the report and recommendation to which the party objected under a *de novo* standard of review. 28 U.S.C. § 636(b)(1)(C); *see also Larocco v. Jackson*, No. 10-CV-1651, 2010 WL 5068006, at *2 (E.D.N.Y. Dec. 6, 2010). The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. 28 U.S.C. § 636(b)(1)(C); *see also Larocco*, 2010 WL 5068006, at *2. The clearly erroneous standard also

applies when a party makes only conclusory or general objections, or simply reiterates its original arguments. *See Rahman v. Fischer*, No. 10-CV-1496, 2014 WL 688980, at *1 (N.D.N.Y. Feb. 20, 2014) ("If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error." (citations omitted)); *Time Square Foods Imports LLC v. Philbin*, No. 12-CV-9101, 2014 WL 521242, at *2 (S.D.N.Y. Feb. 10, 2014) (clearly erroneous standard applies when party reiterates arguments made to the magistrate judge); *see also DePrima v. City of New York Dep't of Educ.*, No. 12-CV-3626, 2014 WL 1155282, at *3 (E.D.N.Y. Mar. 20, 2014) (collecting cases).

### ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor

of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The Second Circuit has "cautioned that [w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Taddeo v. L.M. Berry & Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

### b. Unopposed Recommendations

Five of Judge Scanlon's recommendations were unopposed. The Court has reviewed the unopposed R&R, and, finding no clear error, the Court adopts those recommendations as to these issues pursuant to 28 U.S.C. § 636(b)(1), and (1) dismisses all of Plaintiff's claims against DOC, (2) grants Plaintiff's request to withdraw her Section 1983 claims, (3) dismisses Plaintiff's § 1981 gender discrimination claims, (4) dismisses Plaintiff's § 1981, NYSHRL and NYCHRL claims against Defendant Schiro in her individual capacity, and (5) denies Defendants' summary judgment motion as to Plaintiff's race and gender discrimination claims brought pursuant to Title VII, § 1981, the NYSHRL and the NYCHRL as to the denial of specialty-pay.

### c. Plaintiff's objections

Plaintiff objects to five of the recommendations in the R&R, arguing that Judge Scanlon erred in recommending the grant of summary judgment with respect to Plaintiff's: (1) race and gender discrimination claims with regard to the preferential allocation of vacations and holidays / weekly "pass days" during her time at the ID, (2) race and gender discrimination claims concerning her transfer from the ID to NIC, (3) gender discrimination claims arising from the various allegations during her tenure at the NIC and AMKC, (4) hostile work environment

claims stemming from her time at the NIC and AMKC, and (5) retaliation claims. (Pl. Obj. 1–2.)

Plaintiff also asserts that Judge Scanlon erred with respect to analyzing Plaintiff's claims brought

pursuant to the NYCHRL. (*Id.* at 12–13.) The Court reviews these issues *de novo*, except where

Plaintiff's objections merely reiterate the arguments made to Judge Scanlon or are perfunctory

and generalized, which recommendations the Court reviews for clear error. For the reasons set

forth below, Judge Scanlon's R&R is adopted in its entirety.

### d. Race and Gender Discrimination Claims — Vacation, holiday and weekly "pass days" and transfer to the NIC

Plaintiff argues that Judge Scanlon erred in recommending summary judgment as to

Plaintiff's claims that Defendants discriminated against her on the basis of race and gender by

(1) allocating vacation, holiday and weekly "pass days" in a discriminatory manner during her

time at the ID, and (2) transferring her from the ID to the NIC.

Title VII prohibits an employer from discriminating "against any individual with respect

to [her] compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of

disparate treatment under Title VII, the NYSHRL and § 1981 are assessed using the burden-

shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).[7] *See e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Texas*

---

[7] The burden of proof and production for employment discrimination claims under Title VII, the NYSHRL and § 1981 are identical. *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013) ("For a claim of employment discrimination under 42 U.S.C. §§ 1981 . . . we apply the familiar burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*" (quoting *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 n.3 (2003) and citing *McDonnell Douglas Corp. v. Green* 411 U.S. 792, 802–03 (1973))); *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) ("A plaintiff's efforts to establish the second element of a § 1981 claim are subject to the same burden-shifting analysis as intentional discrimination claims brought under Title VII of the Civil Rights Act of 1964" (citing *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999)) *cert. denied*, 568 U.S. ---, 133 S. Ct. 527 (2012); *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir.

*Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253–55 (1981); *United States v. City of New York*, 717 F.3d 72, 83–84 (2d Cir. 2013) (discussing application of *McDonnell Douglas* framework to race discrimination claim). Under the framework, a plaintiff must first establish a *prima facie* case of discrimination. *Hicks*, 509 U.S. at 506; *see also Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 F. App'x 9, 11 (2d Cir. 2013); *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *Hicks*, 509 U.S. at 506). If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07; *Ruiz*, 609 F.3d at 492. The defendant's burden "is not a particularly steep hurdle." *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). "If the employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination." *United States v. City of New York*, 717 F.3d at 102. To defeat summary judgment at this stage, "a plaintiff need only show that the defendant was in fact motivated at least in part by the prohibited discriminatory animus." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010); *see also Univ. of*

---

2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n.1 (2d Cir. 1999))).

Claims of employment discrimination, retaliation, and hostile work environment brought pursuant to the NYCHRL are to "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof," and are analyzed separately from claims brought pursuant to state and federal law. *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). Plaintiff makes a separate objection that Judge Scanlon erred by not applying a more liberal standard to Plaintiff's claims brought pursuant to the NYCHRL; this objection is discussed *infra* in part II.h.

*Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII . . . [must] show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.").

To establish a *prima facie* case of employment discrimination under Title VII, a plaintiff must show that: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012); *see also Mills v. S. Connecticut State Univ.*, 519 F. App'x 73, 75 (2d Cir. 2013); *Ruiz*, 609 F.3d at 491–92.

Judge Scanlon found that Plaintiff failed to establish a *prima facie* case of race and gender discrimination as to either the allocation of vacation, holidays and weekly "pass days," or the transfer from the ID to NIC. For the reasons discussed below, the Court agrees.

### i. Denial of holidays, vacation days and weekly "pass days"

Plaintiff objects to Judge Scanlon's determination that she failed to establish a *prima facie* claim of race or gender discrimination in connection with the allocation of vacation, holidays and weekly "pass days", because the denial of vacation requests and religious holidays is not a material adverse action, Plaintiff had not established that she was actually denied her preferred vacation time, holidays or "pass day" requests and therefore had not shown any adverse employment action, and Plaintiff had not raised any inference of discrimination that could arise in connection with any hypothetical denial of vacation, holiday, or weekly "pass day" requests. (R&R 30–37.) Plaintiff argues that (1) a reasonable jury could find that the exhibit submitted by Plaintiff in support of her opposition to summary judgment entitled "Vacation Pick

2009–2010," combined with Plaintiff's testimony that Bialek received preferential treatment was sufficient to "indicate[] disparate treatment," and (2) Judge Scanlon "erred in not viewing the vacation request in conjunction with the holiday issue." (Pl. Obj. 2–3.)

Plaintiff has not shown that she suffered an adverse employment action. In order to establish a *prima facie* case of disparate treatment, a plaintiff must show that she experienced a materially adverse employment action. "An adverse employment action is a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). Such action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown*, 673 F.3d at 150 (quoting *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006)). Plaintiff concedes that Judge Scanlon correctly observed that "the denial of a single vacation request, without any indication that there was an absolute prohibition against [P]laintiff taking any vacation time, is not a material adverse employment action." (Pl. Obj. 3; R&R 31 (citations omitted)); *see also Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 262 (S.D.N.Y. 2011) (same), *aff'd*, 513 F. App'x 34 (2d Cir. 2013). Likewise, Judge Scanlon found that "holiday denials such as the one described here are not considered adverse employment actions in the context of race or gender discrimination," (R&R 37), an finding that Plaintiff does not contest.

Even assuming that denial of a vacation request was a material adverse employment action, Plaintiff has proffered no evidence that she was in fact denied a vacation or holiday request. Nor is there any evidence that Plaintiff requested time off for a vacation or religious holiday that she did not receive, or that she requested weekly pass days that she did not receive. Plaintiff argues that a submission titled "Vacation Pick, 2009–2010," along with her testimony that Bialek, a white male, was given preference, shows "disparate treatment." (Pl. Obj. 3.)

However, Plaintiff's argument is problematic for several reasons. First, Plaintiff's testimony that she relies on does not discuss the exhibit she points to or vacation days. (*See* Pl. Dep. 25:4–26:10.) Plaintiff only discusses Bialek's pass days of Friday/Saturday, and religious holidays. Thus, nothing in Plaintiff's deposition testimony provides any evidence in support of Plaintiff's claim on those issues. In addition, the document Plaintiff relies on is also of no support. As an initial matter, the document is not self-explanatory and Plaintiff has failed to explain this document. Plaintiff simply argues that "Plaintiff was denied her vacation pick while Bialek was granted his choices . . ., as is evident from the big cross drawn on Plaintiff's vacation pick."[8] (Pl. 56.1 ¶ 6.) Without any explanation of the document the Court cannot assume that it contains relevant information or that it can be interpreted in the manner that Plaintiff urges. Moreover, even if Plaintiff had submitted an explanation with this document, and assuming the document is admissible evidence and contains information about the rank of the captains at DOC and the priority order for scheduling their vacation days, that information would not be helpful to Plaintiff in establishing a *prima facie* case of discrimination based on race or gender since it would not provide any evidence that Plaintiff did not receive her preferred vacation days. Plaintiff has failed to establish any adverse action relative to scheduling her vacation, holiday and weekly "pass day." *See Waters v. Gen. Bd. of Global Ministries*, 769 F. Supp. 2d 545, 558 (S.D.N.Y. 2011) ("[T]he record is devoid of evidence that GBGM cancelled Waters' vacation requests, isolated Waters from her co-workers, or punished her for missing meetings. Thus, we have no basis to conclude that this conduct occurred or that, even it if had occurred, the conduct would rise to the level of materially adverse employment action.").

---

[8] Plaintiff does not address other aspects of this document, such as the seven other names on the table that each have a handwritten "X" on it, the significance, if any, of the dates at the top of each of the six columns, or the significance, if any, of Plaintiff's name and Bialek's name being in different columns.

Furthermore, even if Plaintiff had sufficiently shown an adverse employment action as to the distribution of vacation, holiday or weekly "pass days," the claim nevertheless fails because Plaintiff failed to raise any inference of discrimination as to any hypothetical adverse action. Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro–N. Commuter R.R.*, 866 F. Supp. 2d 196 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)); *see also Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *6 (E.D.N.Y. July 30, 2013) (same). "No one particular type of proof is required . . . ." An inference of discrimination can be drawn from circumstances such as "the more favorable treatment of employees not in the protected group. . . ." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001) (quoting *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

Plaintiff attempts to raise an inference of discrimination by comparing her treatment to that of a similarly situated captain, Bialek, who was allegedly treated differently than Plaintiff. As a captain who was appointed to the ID on the same day as Plaintiff and had the same job responsibilities, the Court assumes that Bialek is similarly situated to Plaintiff for purposes of analyzing the differential allocation of vacation, holiday and weekly "pass day" benefits. (*See, e.g.*, R&R 42.) However, Plaintiff's allegation that she received differential treatment from Bialek is belied by the evidentiary record. While Plaintiff testified that Bialek received "both Christian and Jewish holidays off," the record shows that Bialek worked on Christmas Day and Easter Sunday in both 2008 and 2009, but does not show whether or not he worked on any Jewish holidays. Plaintiff argues that the Court should not conduct a "specific analysis" of whether Bialek had in fact worked on Jewish holidays since she "specifically testified that Bialek

. . . was allowed the Friday/Saturday but then he was allowed to take off on the Christian holidays as well." (Pl. Obj. 4.) Plaintiff misunderstands the Court's role at this stage of the litigation. While the Court is not allowed to weigh the evidence and must draw all inferences in favor of Plaintiff, the Court can only rely on competent evidence, not hearsay, to rule on the motion before it. *See DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) ("[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" (citing Fed. R. Civ. P. 56(c)(4) and Fed. R. Evid. 602)); *Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 222 (2d Cir. 2004) (noting that "testimony proffered by [plaintiff] was not competent evidence in opposition to summary judgment in the present case because, as proffered, it was hearsay"). Plaintiff has presented no information to this Court to indicate the basis of her knowledge as to the holidays that Bialek worked. Moreover, the record evidence that is before the Court explicitly contradicts the allegations made by Plaintiff. Even drawing all inferences in favor of Plaintiff, the Court must conclude that this claim is unsubstantiated. Because there is no evidence in the record that Bialek was treated differently from Plaintiff, she cannot meet her burden to demonstrate that any disparity in allocation of vacation, holiday and weekly "pass days" was a result of discriminatory motivation. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (finding that plaintiff who could not show that other male supervisors whose disciplinary investigations were "handled exactly as Shumway's was" and had the exact same outcome were "treated differently" as required to raise an inference of discrimination); *Quarless v. Bronx-Lebanon Hosp. Ctr.*, 228 F. Supp. 2d 377, 385 (S.D.N.Y. 2002) (finding that plaintiff could not raise an inference of discrimination where he "put forward no evidence that he was paid less than other

similarly situated employees"), *aff'd*, 75 F. App'x 846 (2d Cir. 2003); *Campbell v. Alliance Nat. Inc.*, 107 F. Supp. 2d 234, 244 (S.D.N.Y. 2000) (finding that plaintiff had failed to establish that she was paid less than similarly situated white employees and noting that "[e]ven if these individuals were similarly situated, plaintiff's claim that they were paid more than her is factually incorrect").

In sum, even if being denied one's preference for scheduling vacation, holidays,or weekly "pass days" were a material adverse employment action, Plaintiff has not proffered any competent evidence establishing that she in fact experienced such a denial. Accordingly, the Court finds, as Judge Scanlon did, that Plaintiff cannot establish a *prima facie* case of discrimination with respect to the allocation of vacation, holidays and weekly "pass days."

### ii. Transfer to North Infirmary Command

Judge Scanlon found that Plaintiff could not show that her transfer from the ID to NIC was a material adverse employment action, because there was no evidence regarding the differences between Plaintiff's work at ID and at the NIC. (R&R 53, 55, 57.) Plaintiff argues that "a transfer may constitute an adverse employment action where, as here, it was intended to harass and Defendants perceived it as such." (Pl. Obj. 4. (citing *Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003)).) Plaintiff also argues that the transfer was undesirable "as evidenced by the fact that it was involuntary and allegedly done based upon seniority." (Pl. Obj. 4.)

"While a 'nominally lateral transfer, even without any loss in salary, can constitute an adverse employment action under Title VII' the plaintiff must 'show that the transfer created a materially significant disadvantage.'" *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 (S.D.N.Y. 2009) (quoting *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) and *Galabya v. New York City Bd. of Educ.*, 202 F.3d

636, 641 (2d Cir. 2000)); *see also Lore v. City of Syracuse*, 670 F.3d 127, 170 (2d Cir. 2012) ("A lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way." (quoting *Patrolmen's Benevolent Assoc. v. City of New York*, 310 F.3d 43, 51 (2d Cir. 2002))); *Terry*, 336 F.3d at 144 ("An internal transfer can be an adverse employment action if accompanied by a negative change in the terms and conditions of employment." (citation and internal quotation marks omitted)); *Moore v. Metro. Transp. Auth.*, --- F. Supp. 2d ---, ---, 2013 WL 4757527, at *11 (S.D.N.Y. Aug. 22, 2013) ("A transfer denial is adverse when 'the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability.'" (quoting *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008))).

Without any evidence before the Court as to her job duties and responsibilities at the NIC after her January 2010 transfer, or other indicators of material disadvantage, there is no evidentiary basis upon which a jury could find that Plaintiff's transfer to the NIC was a material adverse action, as opposed to a lateral transfer that had no impact on the terms and conditions of Plaintiff's employment. Plaintiff alleges in the Complaint that she was told that "she would not be able to get her previous steady tour, nor her steady pass days and would be going on a rotating schedule," and that "for the first four weeks of her assignment to the North Infirmary Command [P]laintiff was not assigned a locker and either had to change in her car or at her old Command." However, Plaintiff has not presented any evidence in support of these allegations, not even her sworn testimony. Even if Plaintiff had proffered sufficient evidence to substantiate these allegations, the absence of a locker and the change to her working hours is not a material adverse

employment action. *See Johnson v. Eastchester Union Free Sch. Dist.*, 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002) (finding that plaintiff had not "suffered an adverse employment action by a lateral transfer and change in hours" where there was no evidence that his job responsibilities were altered or that he suffered a "diminution in compensation, employment benefits, seniority status or any other emolument of his employment").

Plaintiff is correct that the Second Circuit has suggested that a material adverse employment action can be established by reference to a defendant's intent to harass or discipline, at least in the context of retaliation claims. *Terry*, 336 F.3d at 144 (finding that an employer transferring an employee "with the intent to harass him" may be a material adverse employment action in the context of a retaliation claim, where that employee "put forth evidence sufficient to permit a trier-of-fact to conclude that his supervisors believed that he would find the new assignment to be adverse"); *see also Richardson v. N.Y.S. Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999) (finding that plaintiff's transfer to a position that "involved different job responsibilities and . . . involve[ed] contact with the prisoner population," where plaintiff testified that she believed she was transferred "in the hopes that she would quit" was a materially adverse employment action for purposes of a retaliation claim). Assuming, as Plaintiff appears to argue, that *Terry* establishes that a material adverse action can be established *solely* by looking to the intent of the transferring supervisor, here, the record indicates that Defendants' intention was to "work with the best staff [they] could find." (Wall Dep. 55:13–14.) Thus, even under Plaintiff's interpretation of the Second Circuit's decision in *Terry*, Plaintiff cannot meet her burden to show that Defendants "harass[ed]" or "discipline[d]" Plaintiff because there is no

evidence that Wall or White harbored any intent to harass or punish Plaintiff.[9]

Because Plaintiff has not substantiated her conclusory allegation with any evidence that the transfer to the NIC was a material adverse employment action, the Court finds that Plaintiff cannot establish a *prima facie* case of discrimination as to her transfer to the NIC, and adopts Judge Scanlon's recommendation.

### e.   Gender Discrimination Claims — Plaintiff's time at the NIC and AKMC

Judge Scanlon recommended that the Court dismiss Plaintiff's claims of gender discrimination arising from her time at the NIC and AMKC, because (1) Plaintiff failed to establish that Defendants' scrutiny, criticisms, and disciplines of her were adverse employment actions and (2) Plaintiff failed to raise an inference of discrimination with respect to the lack of a locker and the conditions of the women's locker room.  Plaintiff argues that Judge Scanlon erred in analyzing each example of adverse action by the Defendants in isolation instead of viewing them as a whole, and by "disregarding the simple fact that not having a locker and the squalid conditions of the locker room has a different impact on females than it does males."  (Pl. Obj. 6.)

Plaintiff alleged that several actions by Defendants were discriminatory; of these, Judge Scanlon found that the following were not material adverse employment actions: (1) Plaintiff's transfer from NIC to AMKC, (R&R 59–61), (2) Plaintiff's rotating schedule in lieu of fixed hours, (*id*. at 62–63), (3) excessive scrutiny and verbal criticism of Plaintiff's job performance,[10]

---

[9]  While Plaintiff may be able to successfully argue that Wall's motivation in transferring Plaintiff instead of Bialek was his preference for Bialek, such a motivation does not raise an inference that Wall therefore intended to harass or punish Plaintiff.

[10]  Judge Scanlon noted that Plaintiff has shown disparate treatment vis-à-vis her male counterparts with respect to Major's verbal reprimand of Plaintiff for not having her helmet visor in the proper position during an emergency response drill, but concluded that even if this evidence could establish an inference of discrimination as to this reprimand, that Plaintiff still had not shown that the reprimand, or the excessive scrutiny and criticism in general, were material adverse employment actions.  (R&R 67.)

and issuance of corrective forms of discipline, (*id.* at 65–67), and (4) the two command

disciplines issued in June and July 2010 by Moses, which were dismissed on technical grounds,[11]

(*id.* at 69–70). Plaintiff argues, without citation to any authority, that Judge Scanlon erred in not

viewing the acts in concert. Assuming *arguendo* that the Court could properly aggregate all of

the complained-of conduct,[12] and doing so, the Court's conclusion is the same — the collective

---

[11] Judge Scanlon did not address whether the command discipline issued on August 18, 2010, for which Plaintiff alleges that she lost a vacation day, is "actionable insofar as Plaintiff testified that she has appealed the decision and has not yet received a decision." (R&R 69.) Plaintiff has not provided any evidence that this appeal was decided. In light of Plaintiff's testimony that, as a result of the command discipline, she lost one vacation day, (*see* Pl. Dep. 33:34–34:1), and the fact that Defendants do not contest this allegation, the Court will assume that Plaintiff lost a vacation day. It is unclear whether the loss of one vacation day rises to the level of a material adverse employment action. "[T]he Second Circuit has not yet decided whether a one-day suspension without pay alone constitutes an adverse employment action, [and] district courts within the Circuit have come to different conclusions on the issue." *See Martinez v. Conn. S. Library*, 817 F. Supp. 2d 28, 41 (D. Conn. 2011) (collecting cases). For purposes of this motion, the Court assumes without deciding that a loss of one vacation day is a material adverse employment action.

[12] It is not clear whether state and federal antidiscrimination laws permit the Court to aggregate individual discrete acts to attempt to satisfy the "adverse employment action" prong of Plaintiff's *prima facie* case. Several district courts have rejected this approach. *See Kaur v. New York City Health & Hospitals Corp.*, 688 F. Supp. 2d 317, 332 (S.D.N.Y. 2010) ("It should also be noted that there is no authority for the proposition that this Court should consider the cumulative effect of individually alleged adverse employment actions when evaluating Plaintiff's discrimination claim."); *Figueroa v. New York Health & Hospitals Corp.*, 500 F. Supp. 2d 224, 230 (S.D.N.Y. 2007) ("Plaintiff cites no case law, and this Court is aware of none, which supports the proposition that we are to consider the cumulative effect of individually alleged adverse employment actions when evaluating an intentional discrimination claim, as plaintiff alleges here."); *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006) ("Although . . . Title VII hostile work environment claims and retaliation claims involve different findings regarding adverse employment actions, the Plaintiff cites no law, and the Court is aware of none, that supports the proposition that the Court can consider the cumulative effect of non-adverse employment actions when evaluating an intentional discrimination claim.").
        However, the Second Circuit has suggested that such an argument is cognizable under Title VII. *See Cunningham v. N.Y.S. Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009) (addressing a "litany of actions [including] unfounded charges of time abuse, reassignment of offices, discontinuing [a training conference organized by plaintiff, and excluding plaintiff from a conference and a hiring decision] that, according to plaintiff, constitute adverse employment

impact, as with each individual action, never resulted in any *material* change to the terms and conditions of Plaintiff's employment. First, in the absence of any evidence regarding her responsibilities and working conditions while at NIC, the Court cannot find that her transfer from NIC to AMKC created a "materially significant disadvantage," as is required to show that the transfer was a material adverse employment action. *See Galabya*, 202 F.3d at 641. As for Plaintiff's excessive scrutiny and discipline at AMKC, while Plaintiff undoubtedly felt subjectively discouraged by the excessive verbal scrutiny and imposition of report-writing requirements, the undesirable rotating schedule and the unwarranted command disciplines, there is no evidence that these actions by Defendants prevented her from advancing in her career or otherwise materially altered the conditions of her employment. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) ("[C]riticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." (citation omitted)); *see also Sesay-Harrell v. N.Y.C Dep't of Homeless Servs.*, No. 12-CV-925, 2013 WL 6244158, at *15 (S.D.N.Y. Dec. 2, 2013) (disciplinary measures and supervisory inaction not adverse employment actions); *Dawson v. City of New York*, No. 09-CV-5348, 2013 WL 4504620, at *10 (S.D.N.Y. Aug. 19, 2013) ("Excessive scrutiny, monitoring, and criticisms of her job performance," not adverse employment actions absent evidence of materially adverse impact). The Court finds that these actions, individually or collectively, were not material adverse employment actions.

As for the remaining actions complained of by Plaintiff regarding the conditions in the

action when 'considered in their totality,'" and finding that "plaintiff's allegations are — each and together — nothing more than everyday workplace grievances" and not an adverse employment action for purposes of employment discrimination claim." (citing *Galabya*, 202 F.3d at 640)). The Court need not decide this issue since whether considered individually or in the aggregate, Plaintiff has not shown that she suffered any adverse employment action.

locker room and Defendants' failure to assign her a locker, even assuming that these did constitute material adverse employment actions, they did not occur under circumstances giving rise to any inference of discrimination.  Plaintiff has not offered any evidence to support her hypothesis that the reason (or a reason) that she was not assigned a locker when she arrived at AMKC was because she was a woman.   Plaintiff simply believes that is the case, but has not provided the Court with any basis for inferring that this belief is true.  Plaintiff's bare allegation expressing her belief is insufficient.  *See Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 463–64 (W.D.N.Y. 2009) (finding that the plaintiff's "subjective beliefs and naked allegations, unsupported by any facts, of a generalized animus on the part of" the defendants was insufficient to sustain claim of discrimination), *aff'd*, 392 F. App'x 887 (2d Cir. 2010); *Moore*, 2013 WL 3968748, at *6 (noting that a plaintiff's "mere subjective belief that he was discriminated against because of his race does not sustain a race discrimination claim" (citation and internal quotation marks omitted)).  Nor has Plaintiff provided any comparative evidence about the men's locker room.  There is no evidence in the record from any individual with personal knowledge of the number, quality or conditions of the men's locker room at AMKC, and Plaintiff admitted that she had no personal knowledge about the men's locker room.

Assuming, for the purposes of the motion, that the issuance the August 2010 command discipline, which led to Plaintiff's loss of one day of vacation, is a material adverse employment action, Plaintiff has not proffered any evidence from which the Court can infer that she received this command discipline because of her gender.  Plaintiff argues, without citation to authority, that the Court should infer gender animus based on the fact that Defendants treated her differently in a different setting, by verbally reprimanding her for not having her helmet visor in the proper down position during emergency response drills, and that this disparate treatment

should allow for an imputation of discriminatory animus with regard to all of Defendants' other actions, including the issuance of the August 2010 command discipline. (Pl. Obj. 7.) However, Plaintiff has not convinced this Court that differential treatment with respect to one type of discipline and scrutiny should automatically be applied to raise an inference of discrimination as to other types of adverse employment actions she experienced.

Plaintiff's argument about the lockers does not support her disparate treatment claim. Plaintiff argues that even assuming the men's facilities were "equally squalid," or that other male captains were not assigned lockers and therefore had to change in their car, as did Plaintiff, the Court should find that such equal treatment is in fact differential treatment because of the disproportionately humiliating effect that such indignities exact on female captains. Plaintiff's argument, which sounds in disparate impact theory of employment discrimination,[13] is unavailing to establish that Defendants treated Plaintiff "less favorably" than men with respect to lockers and locker rooms. *See Ruiz*, 609 F.3d at 493 ("A showing of disparate treatment — that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' — is a recognized method of raising an inference of discrimination for the purposes of making out a *prima facie* case." (citation omitted)). Plaintiff has failed to raise an inference of discrimination with respect to Defendants' failure to assign a locker to Plaintiff and the conditions of the women's locker room at AKMC.

In sum, Plaintiff cannot establish that she experienced any materially adverse employment actions as required to make out a *prima facie* case of discrimination. Even assuming that the poor conditions in the women's locker room and the issuance of a command

---

[13] *See E.E.O.C. v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 116 (2d Cir. 1999) (Title VII "proscribes facially neutral employment practices which result in discrimination because they fall more harshly on a protected group than on other groups, and cannot be justified.").

discipline resulting in a loss of one vacation day were material adverse employment action, Plaintiff has not proffered sufficient evidence to establish that they occurred under circumstances that give rise to an inference of discrimination. Accordingly, the Court adopts Judge Scanlon's recommendation and grants summary judgment to Defendants as to Plaintiff's claims of gender discrimination at the AMKC.

### f. Hostile Work Environment Claims — Title VII, the NYSHRL and the NYCHRL

Judge Scanlon determined that Plaintiff could not establish a hostile work environment claim because she could not show that (1) Defendants' conduct was motivated by Plaintiff's gender, and (2) that the complained-of actions rose to the level of being "severe" or "pervasive." Plaintiff argues that it was error not to impute the circumstantial evidence of disparate treatment with respect to the helmet-visor reprimands to all of Defendants' conduct to establish severity. (Pl. Obj. 9–10.) Plaintiff also argues that Judge Scanlon erred in concluding that the conditions of Plaintiff's working environment were not "severe" or "pervasive," arguing that "it cannot be said that, as a matter of law, no rational jury could conclude that" the "multiple forms of harassment" Plaintiff endured altered the conditions of Plaintiff's environment and created an abusive working environment. (Pl. Obj. 10.)

In order to establish a hostile work environment claim, a plaintiff must produce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex, or another protected characteristic." *Robinson v. Harvard Prot. Servs.*, 495 F. App'x 140, 141 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Patane*

*v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).[14]  To withstand summary judgment, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quoting *Gorzynski*, 596 F.3d at 102).  "In considering whether a plaintiff has met this burden, courts should 'examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'"  *Id.* (alteration in original) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003)).  Periodic and episodic incidents are not sufficient to establish hostile work environment claims.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("Isolated instances of harassment ordinarily do not rise to this level."); *Das v. Consol. Sch. Dist. of New Britain*, 369 F. App'x 186, 189–90 (2d Cir. 2010) ("Generally, unless an incident of harassment is sufficiently severe, [the] 'incidents [comprising a hostile work environment claim] must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002))).

Plaintiff argues that she endured "not having a locker for three months, vile locker room conditions, constant scrutiny regarding her job performance, criticism about her visor and two

---

[14]  The same standards apply to a plaintiff's hostile environment claim arising under Title VII and the NYSHRL.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 n.4 (2d Cir. 2014) (" The same standards [as are applied to Title VII] apply to the plaintiffs' hostile environment claims arising under the NYSHRL. . . ." (citing, *inter alia*, *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000))); *Summa v. Hofstra Univ.*, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment claims under both [federal law] and the NYSHRL are governed by the same standard." (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006))).

command disciplines." (Pl. Obj. 10.) To sustain a claim of hostile work environment, Plaintiff is required to show that "a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [her] working environment." *See Alfano*, 294 F.3d at 74. Plaintiff does not argue that any one of these incidents are "extraordinarily severe," but rather that, viewed as a whole, they created an abusive working environment. (*See* Pl. Obj. 9–10.) However, even viewed as a whole, these incidents are not sufficiently "severe or pervasive" that they amounted to a transformation of Plaintiff's work environment.

The record shows that Plaintiff was subjected to excessive verbal scrutiny of Plaintiff's performance with respect to appearing in the corridors during inmate movement upwards of 20 to 30 times over the course of the 18 months that Plaintiff was stationed at AMKC, which is approximately twice each month. (*See* Pl. Dep. 56:2–17.) Plaintiff was required to write a report two or three times, (*id*. at 34:16–23), and while the record does not show how frequently Plaintiff was verbally admonished during emergency preparedness drills, Plaintiff testified that she was reprimanded "several times" for not having her helmet visor in the proper down position, and that the admonitions were "so frequent that you just kinda ignore it after a while." (*id*. at 39:10–23). Plaintiff received a total of three command disciplines while she was at AMKC. These actions, considered in their totality, paint a picture of a challenging working environment where Plaintiff was subject to rigid forms of discipline, but, assessing the severity, frequency, and degree of Defendants' alleged abuse, the Court does not find that they created a "workplace . . . so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [Plaintiff's] employment were thereby altered." *See Alfano*, 294 F.3d at 373. While Plaintiff certainly found these conditions to be subjectively humiliating, there is no

evidence that they were physically intimidating, and, based on the record before the Court, the conditions did not occur with such frequency that they could be said to create a "pervasive" hostile work environment. *See Rivera*, 743 F.3d at 20. Nor is there evidence that this excessive scrutiny and criticism interfered with Plaintiff's job performance. *See id*. Indeed, as Plaintiff notes, she "kinda ignore[d]" the reprimands about her helmet visor "after a while." Viewing all of these circumstances in total, Plaintiff has not shown that Defendants' subjecting her to excessive scrutiny and discipline was so "severe or pervasive" as to comprise an actionable hostile work environment claim. *See Demoret v. Zegarelli*, 451 F.3d 140, 150 (2d Cir. 2006) (affirming grant of summary judgment to defendants on hostile work environment claim where a supervisor's "close monitoring of [plaintiff's] work, his mild rudeness to her, . . . his failure to take advantage of all of her abilities, . . . reviewing her budget with a fine-toothed comb and his criticizing her for being five minutes late to department meetings even though male employees could skip meetings with impunity" was not " so severe as to be abusive"); *Early v. Wyeth Pharm., Inc.*, 603 F. Supp. 2d 556, 580 (S.D.N.Y. 2009) (finding "improper supervision," comprised of "allegations that [her supervisor] observed her from behind a machine, requested to see the contents of her pockets and threatened her job due to her admitted paperwork errors" did not comprise a hostile work environment).

Plaintiff's complaints about the conditions in the locker room and the fact that she did not have a locker for a period of three months and had to change into part of her uniform in her car during that time suggest that the conditions were inconvenient but they do not create a hostile working environment. Although Plaintiff refers to these conditions as "vile," the record shows that the locker room was a repurposed closet and, as such, lacked running water and ventilation; it does not indicate that the room was dangerous or even dirty. Plaintiff spent approximately

fifteen to thirty minutes using the locker room to change each day, during which time she did not have direct access to bathroom facilities, but Plaintiff does not allege that she did not have access to a bathroom for the remainder of her work shift. For the three months that Plaintiff did not have access to the locker room or a locker, she would change into part of her uniform in her car. While these conditions were inconvenient, they were not physically intimidating or dangerous, and did not give rise to an environment "severely permeated with discriminatory intimidation, ridicule, and insult." *See Dauer v. Verizon Commc'ns Inc.*, No. 03-CV-05047, 2009 WL 186199, at *6–7 (S.D.N.Y. Jan. 26, 2009) (finding that plaintiff's claim of inadequate bathroom facilities for women employees could not sustain a hostile work environment claim "in light of the evidence that Cole had several unisex bathrooms available to her and at times had a women's bathroom available to her").

Moreover, even if Plaintiff could establish that she was subject to an objectively hostile work environment, she cannot show that these conditions were imposed on her "because of" gender. Plaintiff argues that Judge Scanlon erred by finding that Plaintiff had shown circumstantial evidence of disparate treatment on the basis of gender as to the helmet-visor reprimands,[15] but declining "to impute that animus to Defendants' other acts simply because they did not specifically evidence that animus each time." (Pl. Obj. 9.) Plaintiff argues that "[o]bviously, if Defendants exhibited such conduct once, it is reasonable to infer that such bias permeated their entire attitude and conduct." (*Id.*) Plaintiff's argument assumes that the challenged action by Defendants' are in fact a part of the "same actionable hostile work environment." *See Nat'l R.R. Passenger Corp. v. Morgan* ("*Morgan*"), 536 U.S. 101, 120

---

[15] Judge Scanlon found that, of the various actions alleged by Plaintiff to contribute to the creation of a hostile work environment, "the only area where Plaintiff has shown circumstantial evidence of disparate treatment on the basis of gender is as to the helmet-visor reprimands." (R&R 72.)

(2002) ("[A] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice . . . ." (discussing application of "continuing violation" theory to permit courts to consider acts falling outside the statute of limitations for hostile work environment claims)); *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) ("*Morgan* requires courts to make an individualized assessment of whether incidents and episodes are related.").   The very essence of a hostile work environment claim is that the actions comprising the hostile work environment are systematic and "sufficiently continuous and concerted in order to be deemed pervasive." *See Alfano*, 294 F.3d at 374.

Here, the helmet-visor incident, in which Major verbally reprimanded Plaintiff but not a male captain for not having her helmet visor in the proper down position during an emergency response drill, is arguably part of the "same actionable hostile work environment" as the other disciplinary actions and criticism imposed by Major and Moses.   The Court assumes for purposes of this motion that any evidence that the helmet-visor incident was motivated by gender could be extended to the other excessive scrutiny and discipline imposed by Major and Moses in order to show that those actions as a whole were motivated by gender, for purposes of Plaintiff's hostile work environment claim.   *Cf. Alfano*, 294 F.3d at 378 ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on [protected status].").

However, this assumption has no bearing on whether Plaintiff's lack of a locker and the locker room conditions, even if they comprised a hostile work environment, were also the result of gender bias by Major or Moses.   Plaintiff's claims about the conditions of the locker room and

not having a locker cannot be considered part of the same actionable hostile work environment as the claims related to her excessive scrutiny and discipline, because there is no evidence that the actors Plaintiff complains created the hostile work environment had any role or authority with regard to the issuance of lockers or the conditions of the locker rooms.[16]  *See id.* (addressing hostile work environment claim comprised of twelve different incidents, and finding that "four sex-related incidents, none of which were perpetrated by [plaintiff's supervisor], do not justify the inference that wholly different, facially sex-neutral incidents involving [plaintiff's supervisor] were part of any campaign to harass [plaintiff]").   Accordingly, the Court disagrees with Plaintiff's argument that any bias attributable to Major "permeated [Defendants'] entire attitude and conduct."

In sum, Plaintiff has not established that the actions alleged to comprise a hostile work environment are severe or pervasive.  Even if she had, she cannot show that she was subject to the collective actions and conditions comprising such a hostile work environment "because of" her gender.  *See Alfano*, 294 F.3d at 374 ("[I]t is axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her sex." (citation and internal quotation marks omitted)).  The Court finds that Plaintiff has not established a hostile work environment claim and adopts Judge Scanlon's recommendation to grant summary judgment to Defendants as to Plaintiff's hostile work environment claims.

g.      **Retaliation claims — Title VII, the NYSHRL and the NYCHRL.**

Judge Scanlon found that Plaintiff failed to establish a retaliation claim because (1) Plaintiff could only establish that one activity, her EEOC charge stamped as "received" by the EEOC on

---

[16]  Plaintiff names Robert Cripps as one individual responsible for the conditions of the locker room, but does not reference or argue that either Major or Moses were in any way responsible.  (Pl. Dep. 41:5–8, 48:16–24.)

August 20, 2014, was "protected," and (2) all arguably adverse actions that Plaintiff experienced preceded this protected activity, preventing Plaintiff from establishing a *prima facie* case of retaliation. (R&R 79–100.) Plaintiff argues that her October 2009 protest to Castillo that it was "not fair," that she had been placed on temporary status while Bialek received a permanent position at the ID was, when viewed in context, was protected activity, and her request for a transfer out of the AMKC on July 2, 2010, "Due to Hostile Work Environment," was also protected activity because of its use of a "term of art which refers to protected activity." (Pl. Obj. 11–12.)

In order to establish a *prima facie* case of retaliation, a plaintiff must establish "(1) she engaged in protected activity; (2) the employer was aware of this activity; (3) the employee suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013); *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006). Title VII's antiretaliation provision is "construed to cover a broad range of employer conduct." *Thompson v. N. Am. Stainless, LP*, 562 U.S. ---, ---, 131 S. Ct. 863, 868 (2011). It is not necessary that the conduct is actually prohibited by Title VII, but only that the plaintiff had a "good faith belief" that such conduct was prohibited. *La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d

Cir. 2002))); *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp.2d ---, ---, 2013 WL 4432354, at *20 (E.D.N.Y. Aug. 14, 2013) (plaintiff need only have a "good faith belief" that employer conduct was prohibited"); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.'" (quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000))). The complaint can be informal — an employee does not need to lodge a formal complaint of discrimination. *See Cruz*, 202 F.3d at 566 ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection . . . .'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))). However, while such complaints may be informal, they cannot be so vague or "generalized" that the employer could not "reasonably have understood[] that the plaintiff's complaint was directed at conduct prohibited by Title VII." *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011) (alteration and citation omitted).

### i. Plaintiff's October 2009 statement to Castillo

Plaintiff argues that the context surrounding her 2009 comment to Castillo — "That's not fair. That's not the way you do business." — makes this statement a complaint about gender discrimination instead of a generalized complaint. When Plaintiff questioned why she had not received seniority pay and learned that it was because she had been placed on temporary status while Bialek had received a permanent appointment, Castillo told Plaintiff "that's his boy," referring to Bialek as Wall's "boy." Plaintiff argues that her statement is sufficiently clear that she was complaining about gender discrimination when she commented that it was "not fair." Drawing all inferences in favor of Plaintiff and considering the statement "that's his boy" as a reference to unequal gender treatment, even with this context, a reasonable jury could not find that the conversation had the result that Defendants "'understood, or could have reasonably

understood,' that the plaintiff's complaints . . . were based on conduct prohibited by Title VII." *Rosioreanu v. City of New York*, 526 F. App'x 118, 120 (2d Cir. 2013) (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)). Because Plaintiff's complaint, even viewed in the context of Castillo's remark, "that's his boy," was a generalized expression of unfairness based on friendship, it could not reasonably have put Defendants on notice that she was "complaining of disparate treatment based on sex — and thereby engaging in a protected activity." [17] *Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 28 (2d Cir. 2013) (finding that the plaintiff failed to demonstrate that the defendant had knowledge of his protected activity); *Rojas*, 660 F.3d at 108 (the plaintiff's "generalized" complaints were not protected activity where employer "could not reasonably have understood that she was complaining of 'conduct prohibited by Title VII'" (quoting *Galdieri-Ambrosini*, 136 F.3d at 292).

### ii. Plaintiff's July 2010 transfer request

Plaintiff argues that her use of the term "hostile work environment" in her July 2, 2010 request to transfer out of AMKC is a term of art that transformed that request into a protected activity. (Pl. Obj. 12.) While it is true that a complaint about discrimination can be an "informal" one, it still must reasonably place an employer on notice that a plaintiff is complaining about discrimination based on gender, *see Rojas*, 660 F.3d at 108, and result from conduct that a plaintiff herself had a "good faith, reasonable belief" was prohibited by antidiscrimination laws, *see Cruz*, 202 F.3d at 566. Assuming, as Plaintiff argues, that the term

---

[17] Plaintiff also argues that Judge Scanlon erred in finding that Plaintiff did not engage in protected activity prior to her April 2010 transfer from NIC to AMKC, arguing that the April 2010 transfer should be viewed as part of the January 2010 transfer, both of which were in retaliation for Plaintiff's protected activity in October 2009 of protesting the decision to award specialty-pay to Bialek and not to her. (Pl. Obj. 12.) Because Plaintiff cannot show that her statement to Castillo in October 2009 was protected activity, the Court need not address whether Plaintiff's transfer in April 2010 was in retaliation for that statement.

"hostile work environment" would have placed Defendants on notice that Plaintiff was complaining specifically about gender-based discrimination, Plaintiff still has not presented any evidence to establish that the basis for her complaint was a belief that her working conditions were a result of unlawful discrimination. There is no statement in Plaintiff's own testimony that her request to transfer was motivated by her belief that her working conditions were infused with gender discrimination. There is also no contextual evidence of Plaintiff's comments to her co-workers or other supervisors expressing a belief that the work environment was discriminatory, or otherwise indicating that her conduct was protected activity rather than a general complaint. *See Bey v. I.B.E.W. Local Union # 3 Union Representatives*, 374 F. App'x 187, 188 (2d Cir. 2010) ("a transfer request is not a 'protected activity' within the meaning of 42 U.S.C. § 2000e-3"); *Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (finding that email sent "to express[] the student concerns" and "inform [defendant] of the impact of [his] actions" was not protected activity for purposes of a Title VI retaliation claim).

In sum, because Plaintiff has not established that Defendants could reasonably have understood Plaintiff's statement to Castillo in October 2009, or her transfer request in July 2010, to be objections to discriminatory conduct based on her gender, the Court finds that Plaintiff failed to state a retaliation claim and adopts Judge Scanlon's recommendation to dismiss Plaintiff's claims of retaliation.

### h. NYCHRL Claims

Judge Scanlon analyzed Plaintiff's NYCHRL claims separately, and found that Plaintiff could not sustain claims under the NYCHRL with respect to (1) race and gender discrimination concerning the preferential allocation of vacations and holidays / weekly "pass days" during her time at the ID, (R&R 31–32, 34–35), (2) race and gender discrimination concerning her transfer from the ID to NIC, (*id.* at 55–57), (3) gender discrimination arising from the various allegations

during her tenure at the NIC and AMKC, (*id*. at 60–61, 63–64, 66), (4) hostile work environment stemming from her time at the NIC and AMKC, (*id*. at 75–78), and (5) retaliation, (*id*. at 84–85, 87, 91–94, 96, 100). Plaintiff argues that Judge Scanlon failed to take into account the "broad and remedial purpose" of the NYCHRL in the separate analysis of these claims. (Pl. Obj. 12–13 (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).) Plaintiff notes that the standard for discrimination claims under the NYCHRL differs from the standard under federal and state law, as the NYCHRL does not require a "materially" adverse action. (*Id*. at 13.) Plaintiff does not contend that Judge Scanlon failed to conduct a separate analysis for each of Plaintiff's allegedly adverse discriminatory actions under the NYCHRL, applying this more liberal standard. (*See, e.g.*, R&R 28–29 (setting forth separate legal standard for discrimination claims under the NYCHRL); *id*. at 31–32, 34–35 (analyzing claim of discriminatory allocation of vacation, holidays and weekly "pass days" under the NYCHRL); *id*. at 60 (analyzing transfer to AMKC under the NYCHRL); *id*. at 66 (analyzing excessive scrutiny and criticisms under the NYCHRL).)[18] Plaintiff does not make any specific objection to any recommendation by Judge Scanlon as to Plaintiff's NYCHRL claims; only a generalized and perfunctory objection to Judge Scanlon's recommendations as to these claims. In view of Plaintiff's lack of a specific objection, the Court reviews these recommendations for clear error and, finding none, adopts Judge Scanlon's recommendation to grant Defendants' motion for summary judgment as to all of Plaintiff's claims under the NYCHRL, except as to Plaintiff's race and gender discrimination claim as to the denial of specialty-pay.

---

[18] Although Plaintiff did not discuss the separate legal standards under the NYCHRL for hostile work environment claims and claims of retaliation, Judge Scanlon also analyzed each of these claims and each element of those claims separately under the NYCHRL. (*See* R&R at 75–79 (analyzing hostile work environment claim under the NYCHRL); *id*. at 84, 87, 91–94 (analyzing claims of retaliation separately under the NYCHRL).)

## III. Conclusion

For the foregoing reasons, the Court adopts Judge Scanlon's R&R in its entirety, and (1) dismisses all of Plaintiff's claims against DOC, (2) grants Plaintiff's request to withdraw her § 1983 claims, (3) dismisses Plaintiff's § 1981 gender discrimination claims, (4) dismisses Plaintiff's § 1981, NYSHRL and NYCHRL claims against Defendant Schiro in her individual capacity, (5) denies Defendants' summary judgment motion as to Plaintiff's federal, state and city race and gender discrimination claims as to the denial of specialty-pay, (6) grants Defendants' summary judgment motion as to Plaintiff's federal, state and city law race and gender discrimination claims as to the allegation of preferential allocation of vacation, holiday and weekly "pass days" during her employment at the Investigations Division, (7) grants Defendants' summary judgment motion as to Plaintiff's federal, state and city law race and gender discrimination claims as to her transfer from the Investigations Division to North Infirmary Command, (8) grants Defendants' summary judgment motion as to Plaintiff's federal, state and city law gender discrimination claims relating to various employment actions taken against her during her time at the North Infirmary Command and the Anna M. Kross Center, (9) grants Defendants' summary judgment motion as to Plaintiff's federal, state and city law hostile work environment claims stemming from her time at the North Infirmary Command and the Anna M. Kross Center, and (10) grants Defendants' summary judgment motion as to Plaintiff's federal, state and city law retaliation claims.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2014
      Brooklyn, New York